MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice
MELANIE L. ALSWORTH, Ark. Bar No. 2002095
Acting Assistant Deputy Chief
melanie.alsworth2@usdoj.gov
145 N. Street NE, 2nd Floor, East Wing
Washington, D.C. 20530
Telephone (202) 598-2285

Attorneys for the United States

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**ENHUA FANG,**<br><br>**Defendant.** | CASE NO. 3:24-MJ-00072<br><br>**GOVERNMENT'S MOTION FOR PRETRIAL DETENTION** |

The United States of America, through Melanie L. Alsworth, United States Department of Justice, moves the Court to detain the defendant, Enhua Fang ("FANG" or "the defendant"), pending trial as both a risk of non-appearance and as a danger to the community.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In 2022, multiple federal law enforcement agencies in the Charlotte, North Carolina area investigating drug trafficking organizations ("DTOs") discovered that drug traffickers were delivering bulk cash to couriers of Asian descent. Further investigation by the Drug Enforcement Administration ("DEA"), Charlotte Resident Office, revealed that the DTOs were delivering drug proceeds to a Chinese money laundering organization ("the Organization") utilizing a network of couriers who travel throughout the United States to collect drug proceeds

from DTOs then deposit the drug proceeds into bank accounts controlled by the Organization at financial institutions including JPMorgan Chase, Bank of America, and Wells Fargo.

An extensive investigation by DEA and the Internal Revenue Service-Criminal Investigation ("IRS-CI") uncovered an incredibly active cell operated by FANG. FANG was the initial point of contact for DTOs to arrange a bulk cash pickup of drug proceeds in the United States. By way of example, FANG was intercepted on a federal wiretap on June 1, 2022, arranging to pick up bulk cash drug proceeds from a drug trafficker in North Carolina to pay a source of supply in Mexico. The drug trafficker called FANG and asked to "make an appointment," then said, "I'll text you the serial." The drug trafficker then texted FANG a code, "B384131617G." This is a serial number to a dollar bill used for verification purposes. FANG replied, "How much is the deposit," and the drug trafficker answered, "100," and sent an address of where to meet. Soon thereafter, the drug trafficker texted FANG a different deposit amount, "110." FANG's courier arrived later the same day and collected $110,000 from the drug trafficker. Similar patterns emerged in cases involving other drug traffickers. FANG was contacted, a code was passed, a pickup location was agreed upon, and a courier was dispatched. The bulk cash pickups and deposits were frequent and typically ranged from approximately $100,000 to as much as $300,000.

Financial records revealed approximately 1,149 bulk cash deposits throughout the United States from May 2022 to January 2024 completed by the Organization's known couriers. The total amount of bulk cash deposits exceeds $92 million.

On March 19, 2024, a federal grand jury sitting in the Western District of North Carolina returned an Indictment charging FANG with money laundering conspiracy (Count One), concealment money laundering and aiding and abetting (Counts Two and Five), and engaging in and attempting to engage in monetary transactions involving criminally derived property and

aiding and abetting (Counts Three, Four, and Six). Additional co-conspirators, namely, Shu Jun Zhen, Jianfei Lu, Maoxuan Xia, and Shao Neng Lin, were all charged in Count One, and were also charged in various substantive counts. The Indictment was filed on March 20, 2024.

## II.     APPLICABLE LAW

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D. Cal. 2007).

Under the Bail Reform Act, 18 U.S.C. § 3142, *et seq.*, which governs the detention of a defendant pending trial, the Court shall order a defendant detained if, after a hearing, it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." Generally, the United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757. For pretrial detention, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient, both are not required. *See* 18 U.S.C. § 3142(c). Thus, detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.

In assessing whether there are any conditions that may be imposed to assure the appearance of the person and the safety of any other person or the community, the Court must consider the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and

seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

### III.     FACTS SUPPORTING DETENTION

#### A.     Nature and Circumstances of the Offense

The nature and circumstances of the offense weigh in favor of detention.  Although the charged money laundering offenses do not carry with them a presumption of detention, the scope, scale, and volume of the defendant's criminal conduct warrants detention.

The Organization—of which the defendant was a critical operative at the time of her arrest—provides an essential service to DTOs based in both the United States and Mexico, namely, introducing staggering amounts of drug trafficking proceeds into the legitimate financial system in the United States and abroad.  The Organization does so by picking up bulk cash from its DTO customers, then deposits the bulk cash into a myriad of business bank accounts registered in the name of shell companies and controlled by the Organization.  Once deposited, the illicit funds are laundered further through additional layers of transfers in fiat bank accounts and cryptocurrency accounts.  The defendant and her co-conspirators used sophisticated means, such as multiple and frequently changing communication channels, encrypted messages, and fake driver's licenses, to evade detection by law enforcement.  Without the money laundering services provided by the Organization and other similar money laundering organizations, many of the DTOs' operations would grind to a halt.

The defendant was central to the Organization's money laundering mechanism: she was responsible for receiving requests from Mexican DTOs for bulk cash pickups in the United States, coordinating with U.S.-based drug traffickers to collect the bulk cash, dispatching the Organization's couriers to locations throughout the United States to collect the bulk cash, and directing deposits by the couriers into specific bank accounts.  For example, Kowloon Holding,

Inc., ("Kowloon") was a shell company controlled by the Organization. Multiple bank accounts were opened for Kowloon at various financial institutions. Within about five months, between May and September of 2022, the Organization's couriers known to be under FANG's direction made at least 102 bulk cash deposits, totaling approximately $17.14 million, into Kowloon's accounts at various banks. The couriers carried out these bulk cash deposits in approximately twenty different states, including California, Florida, Illinois, Indiana, Missouri, North Carolina, Tennessee, Texas, Virginia, and Wisconsin. The bulk cash deposited into Kowloon's bank accounts—which were opened by a co-defendant—were usually wire transferred to other bank accounts on the same day before going through additional layers of transfers. For instance, in August 2022, a total of $5,670,264 was deposited into Kowloon's account at Chase Bank, and during the same month, a total of $5,651,593 was transferred out of the same account. Besides these deposits and transfers, Kowloon's bank records are void of any regular and recurring business expenses such as rents, payroll, taxes, purchase of inventory, etc.

      The Ninth Circuit has found that likely punishment provides incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Consideration of the nature of the offenses charged involves consideration of the penalties."). Here, the defendant is facing a lengthy prison sentence—a maximum sentence of twenty years in prison on each of the § 1956 charges and a maximum of ten years in prison on each of the § 1957 charges. Her incentive to flee to her home country of China—a country with which the United States does not have an extradition treaty—is great.

      Not only are the offenses charged against the defendant serious, but their nature and circumstances strongly support her detention because the defendant has significant international connections—with both the Organization's DTO customers and her foreign-based co-conspirators—that could assist in her flight. These connections have substantial financial

resources at their disposal, much of it in the form of untraceable cash and cryptocurrency that is beyond the reach of U.S. law enforcement.

Separately, the investigation has revealed that the Organization is capable of obtaining high-quality, false identification documents for its members. To conceal the nature, source, ownership, or control of the drug proceeds, couriers working for the Organization routinely use fake driver's licenses at bank branches all over the United States. It is foreseeable that the defendant could take advantage of such criminal expertise and dramatically enhance her ability to flee U.S. jurisdiction using false identities.

**B.     Weight of the Evidence**

The weight of the evidence against the defendant is overwhelming and supports her continued detention. By way of example, the Government's evidence at trial will consist of: (1) communications with known members of U.S.-based DTOs arranging the pickup of drug proceeds; (2) testimony from convicted drug traffickers who utilized the Organization's services to pay foreign-based sources of supply; (3) toll records documenting the frequency of contacts with known drug traffickers to arrange the pickup of drug proceeds and the frequency of FANG swapping cellular devices and telephone numbers following bulk cash seizures from the Organization's couriers; (4) bank records of various accounts and numerous currency transaction reports filed by various banks, which will show that couriers working for the Organization deposited bulk cash across the United States into bank accounts controlled by the Organization, including FANG's co-conspirators; (5) footage from banks' security cameras, physical surveillance, and evidence obtained from multiple seizures and investigative stops that will collectively show that the Organization's couriers used false identities to deposit bulk cash into numerous shell company bank accounts controlled by the Organization.

While the defendant is not known to use false identity documents, she did take steps to conceal her identity and connection to criminal activity. The defendant used multiple cellular telephones to coordinate the bulk cash pickups, a fact agents pieced together through toll analysis, voice analysis based on calls made by undercover agents, cell site location data, and other investigative means. In addition to multiple cellular telephones, the defendant routinely changed SIM cards and cellular telephone numbers. For instance, one cellular telephone was used for a one-year period from November 2022 through November 2023, and during this time, eleven different SIM cards and eleven different telephone numbers were associated with the device. Investigation of a second cellular telephone documents its use from May 2022 through November 2023, with seventeen different SIM cards and seventeen different phone numbers associated with the device.

In light of the staggering amount of evidence against her, there is no condition or combination of conditions that could mitigate the defendant's incentive to flee prosecution or mitigate her danger to the community.

C.   **History and Characteristics of the Defendant**

The history and characteristics of the defendant also warrant pretrial detention. While the defendant does not have any criminal convictions, she is an exceedingly poor candidate for pretrial release considering there is a significant risk of flight due to the defendant's potential sentence, lack of any ties to Western District of North Carolina, familial and criminal business connections in China and Mexico, and the resources that the defendant has at her disposal.

The defendant is a Chinese national, approximately 37 years old, who has lived in the United States since March 2021. She is classified as a legal permanent resident. She recently traveled to China for approximately five weeks during the fall of 2023.

7

While the exact origin of her illicit career as a money launderer is unknown, there is no dispute that within fifteen months of her relocation to the United States, she was actively involved with the Organization, dispatching couriers throughout the United States to collect drug proceeds from drug traffickers.

Through its investigation, the government learned that the defendant has a cryptocurrency account. As of December 2023, there was approximately $880,000 in USDT in the account. The cryptocurrency can easily be converted to cash and aid in the defendant's flight.

For these reasons, FANG should be detained.

**D.      Nature and Seriousness of the Danger to the Community**

If not detained, the defendant poses a continuing economic danger to the community. Indeed, upon release, the defendant could continue her main function for the Organization—hiding in the shadows while calling the shots by directing couriers to collect and deposit substantial amounts of drug proceeds collected from drug traffickers throughout the United States, then working with members of the Organization to transfer the funds to other fiat bank accounts and cryptocurrency accounts for ultimate and speedy payout to foreign-based drug sources of supply. This illicit activity burdens the financial system with an influx of illicit funds and weakens the integrity of the banking system. And all of this can be accomplished from anywhere using nothing more than a smart phone or a computer with an Internet connection.

Short of detention, the form of economic danger posed by the defendant cannot be effectively mitigated by any conditions or combination of conditions.

The defendant also poses a danger to the community because she is enabling the criminal conduct of DTOs by accepting illicit funds to wash through legitimate financial systems and payout the proceeds to sources of supply. Just as dealing controlled substances presents a danger

8

to the community, the laundering of millions of dollars in drug proceeds allows DTOs to continue to operate.

## IV. CONCLUSION

The relevant inquiry for the Court is whether there are conditions that can be placed upon the defendant that will reasonably assure the safety of the community and the defendant's appearance at future court proceedings. Here, there are none. The United States respectfully requests that the Court detain the defendant pending trial and find that she poses an unacceptable risk of non-appearance at future court hearings and that she is a danger to the community.

Dated:  April 18, 2024.                                        Respectfully submitted,

                                          MARLON COBAR, Chief
                                          Narcotic and Dangerous Drug Section
                                          Criminal Division
                                          U.S. Department of Justice

By:         */s/ Melanie L. Alsworth*
                    Melanie L. Alsworth
                    Acting Assistant Deputy Chief
                    Narcotic and Dangerous Drug Section
                    Criminal Division
                    U.S. Department of Justice
                    145 N. Street NE, 2E300
                    Washington, D.C.  20530
                    Telephone: (202) 598-2285
                    Email: melanie.alsworth2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via ECF to counsel of record, this 18th day of April 2024.

                                           By: */s/ Melanie L. Alsworth*
                                                   Melanie L. Alsworth
                                                   Acting Assistant Deputy Chief
                                                   United States Department of Justice